J-A22012-13

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TYRONE LAMONT WILLIAMS | |
| Appellant | No. 1682 MDA 2012 |

Appeal from the Judgment of Sentence April 23, 2012
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0004623-2010

BEFORE: GANTMAN, J., ALLEN, J., and MUNDY, J.

MEMORANDUM BY GANTMAN, J.: **FILED AUGUST 12, 2014**

Appellant, Tyrone Lamont Williams, appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas, following his jury trial convictions for first-degree murder, criminal conspiracy, and recklessly endangering another person ("REAP").[1] We affirm.

The trial court opinion fully and correctly set forth the relevant facts of this case as follows:

> Brandon Granthon [("Victim")] was shot in the chest and killed on May 5, 2009 at approximately 1:10 a.m. Officer Garrett Miller ("Officer Miller") of the Harrisburg Bureau of Police ("HBP") was dispatched to the corner of Mulberry and Crescent Streets in Harrisburg City to investigate a report of shots fired. The area is known for high crime and drug traffic. Officer Miller found [Victim] lying on the

---

[1] 18 Pa.C.S.A. §§ 2502(a); 903; 2705, respectively.

sidewalk in front of the McFarland Building apartments, on his back, with a gunshot wound to the chest. [Officer] Miller stated that [Victim] was dressed in all black including black gloves, and a .40 caliber handgun was on the ground to the left of him. Officer Miller described the scene as initially chaotic as several individuals were in the immediate area. [Victim] was loaded into an ambulance for purposes of transport to the hospital for treatment along with Officer Jeffery Cook ("Officer Cook") of the HBP.

While in the ambulance, the EMS personnel had to cut off [Victim's] pants to administer medical treatment which caused a bag to fall out of the pants to the floor. Officer Cook suspected that the bag contained crack cocaine, so he gave it to Officer Miller who subsequently provided it to the forensic officer. After arriving at the hospital emergency room, the ER physician pronounced [Victim] dead at 1:35 a.m.

The substance in the baggy found on [Victim's] body was tested at the [Pennsylvania State Police ("PSP")] Crime Lab by forensic scientist Nicole Blascovich ("Ms. Blascovich"). Ms. Blascovich determined that the substance contained in the baggy found on [Victim's] body was 8.2 grams of crack cocaine. She also tested a substance suspected to be cocaine which had been obtained by Officer Mark McNaughton ("Officer McNaughton") of the HBP when he conducted a search of [Victim's] apartment pursuant to a warrant. Ms. Blascovich determined that the substance in the second baggie was crack cocaine weighing 65/100ths of a gram.

Dr. Wayne Ross, a forensic pathologist for the Dauphin County Coroner's Office performed an autopsy on the body of [Victim]. Upon examination of the body, he discovered [a] hole in [Victim's] chest consistent with a gunshot wound. Upon further examination, Dr. Ross determined that a gunshot went into [Victim's] chest entering the 5th rib on the left side, broke the rib, and went through the liver, heart and lungs. Dr. Ross stated that he found a bullet in blood that was in the lung. Dr. Ross concluded that, as there was no soot or residue on the outside of [Victim's] hoodie, the wound was a "distant gunshot wound" and the "path relative to his body was going front

to back, left to right, and upward." Dr. Ross concluded within a reasonable degree of medical certainty that the cause of [Victim's] death was a gunshot wound to the chest and the manner of death was homicide. Upon evaluation of the position in which [Victim] was found and the path of the bullet within the body, it was Dr. Ross' opinion that when [Victim] was shot he was pulling his body backwards in some manner, lying on the ground or the shooter was pulling backward and running.

On May 4, 2009, [Victim] called Preston Burgess ("Mr. Burgess"), who is also known as "Pepsi," and asked him [to] set up a deal to purchase an ounce of crack cocaine. Mr. Burgess had known [Victim] for several months as he had been [Mr.] Burgess' drug dealer. [Mr.] Burgess contacted another drug dealer he knew, an individual nicknamed "Duke," to set up the sale for [Victim]. Duke later arrived [at] [Mr.] Burgess' house, parked outside in his truck and [Victim] went out to consummate the drug deal. When [Victim] reentered [Mr.] Burgess' house, he stated that he thought that the drugs were "light," meaning less than the ounce he had agreed upon. To remedy the situation, [Mr.] Burgess called Duke who agreed to come back to [Mr.] Burgess' house, later in the evening, to return [Victim's] money in exchange for the drugs.

At the meeting time, [Victim] returned to [Mr.] Burgess' house. Mr. Burgess described him as being dressed in all black including his pants, shirt and gloves, and acting uncomfortable or skittish. Duke did not show up when expected, so [Victim] left. Later, when Duke arrived at [Mr.] Burgess' house, they arranged for [Victim] and Duke to meet at Kiwi's Bar on 13th and Derry Streets to make the exchange and [Mr.] Burgess gave [Victim's] cellphone number to Duke so the two of them could handle the situation themselves. When Duke was at Mr. Burgess' house the second time that day, Appellant, [whom] [Mr.] Burgess, and later police, knew to be called "Slim," unexpectedly arrived first, a minute or two before Duke. The police first learned that Appellant was at [Mr.] Burgess' house on the night of the murder during Mr. Burgess' testimony at the preliminary hearing for charges filed against [Appellant's co-defendant,] Ronald Burton,

who is also known as "Duke." Mr. Burgess had known Appellant from previously buying drugs from him and, when [Appellant] would sell to [Mr.] Burgess, he would come to [Mr.] Burgess' house in a black SUV. Of note is that Appellant had been stopped by police for a traffic violation, in a black Ford Expedition SUV, in May 2010.

Duke and [Appellant] left [Mr.] Burgess' house, on foot, and walked toward the corner of Sylvan Terrace. Mr. Burgess testified that after they left, his girlfriend returned home and they immediately went to a store called the "All Nighter" for cigarettes. While at the All Nighter, within approximately ten (10) minutes of Appellant and Duke leaving, they heard several gunshots fired, one after another. From a police photo array, Mr. Burgess identified Ronald Burton as the person he knew as Duke.

On the night of the murder, two individuals, Greta McAllister ("Ms. McAllister") and Jeffery Lynch ("Mr. Lynch"), were in an alley smoking crack cocaine between Hummel Avenue and Mulberry Street. Both of them testified that they saw two individuals dressed in black with hoods on[,] get out of a dark colored SUV and walk quickly through the alley towards Mulberry Street. Mr. Lynch did not see them carrying guns, but Ms. McAllister did. Mr. Lynch stated he recognized one of the men as an individual nicknamed "Philly" from whom he had previously bought cocaine. Mr. Lynch testified that he heard the man he knew as "Philly" say "hurry up" as the men crouched by a parked car and a light pole at the end of the alley. [Mr.] Lynch then heard one of the men say "there he go" at the same time he saw another man walking on the opposite side of Mulberry Street. Mr. Lynch said that once the man on the opposite side of Mulberry [Street] was out of his sight, the two men in the alley where he was located ran toward the man across the street. Both Ms. McAllister and Mr. Lynch were headed in the other direction, still in the alley, toward Hummel [Avenue], when shots rang out. Mr. Lynch stated that at least 10 shots, of two different caliber bullets, were fired. Ms. McAllister and Mr. Lynch testified that, after the shots were fired, the men ran back down the alley, toward Hummel Avenue and got back into the dark colored SUV. Later, while being interviewed by Detective Christopher Krokos ("Det. Krokos") of the HBP,

- 4 -

Mr. Lynch was able to identify "Philly" from police photos as Ronald Burton.

At the murder scene, HBP forensic investigator Karen Lyda ("Officer Lyda") recovered four (4) spent .45 caliber shell casings on the south side of Mulberry Street, grouped together near the location where [Victim's] body was found. An additional grouping of five (5) spent .45 caliber shell casings was found at the same intersection, across Crescent Street. Officer Lyda also recovered a live .40 caliber bullet and a .40 caliber shell casing. Other evidence obtained at the scene included a mutilated bullet jacket, a cellphone and a left sneaker. Officer Lyda later learned from other investigating officers that a casing was jammed in the recovered .40 caliber hand gun and there were 3 unfired cartridges in the magazine.

During the trial, Corporal Mark Garrett ("Cpl. Garrett") of the [PSP], Bureau of Forensic Sciences processed the firearms evidence submitted by the HBP and presented expert testimony on firearm and tool mark examination. The HBP provided Cpl. Garret with a Beretta semiautomatic .40 caliber pistol, a magazine with three (3) undischarged Remington .40 caliber cartridges, one (1) discharged mutilated bullet jacket, one (1) discharged Remington .40 caliber Smith and Wesson cartridge and five (5) discharged Winchester .45 automatic cartridge cases. After examination and forensic testing of these items, Cpl. Garrett concluded that the five (5) discharged .45 cartridges were all discharged from the same gun, but were definitely not discharged from the .40 caliber Beretta handgun found by [Victim] at the crime scene.

On August 10, 2009, a 2000 gold Cadillac Deville was stopped by police while Appellant was operating the vehicle. In furtherance of the investigation, on August 13, 2009, Detective Rodney Shoeman ("Det. Shoeman") of the HBP was asked to obtain and execute a search warrant for the vehicle operated by Appellant. Det. Shoeman had been informed that Ronald Burton had been seen in that particular vehicle. Lead investigator Detective Ryan Neal ("Det. Neal") had determined that Ronald Burton was also known in the drug community as "Duke" and "Philly" based on photo identification by [Mr.] Lynch and [Mr.] Burgess.

During the search, plastic bags of clothing and toiletry items were found in the trunk of the car along with a green plastic storage tote. In the green storage tote, Detective Shoeman found documents belonging to Ronald Burton. The documents which were recovered were a 2008 W-2 income reporting form, a letter and a PPL electric utility bill all in the name of Ronald Burton.

Det. Neal reviewed [Victim's] cellphone that had been recovered at the scene of the murder and, in the address book, found a number that he confirmed had belonged to Ronald Burton/Duke. By way of search warrant, Det. Neal was able to obtain and review the records for Duke's phone number for May 4 and May 5, 2009. From the records, Det. Neal reviewed the particular cellphone numbers and call history that belonged to Duke/[Mr.] Burton and [Mr.] Burgess/Pepsi. Upon review of the records for the interactions between [Mr.] Burton, [Mr.] Burgess and [Victim] on the night of the murder, Det. Neal determined that multiple calls were made from [Mr.] Burgess' phone to Duke/[Mr.] Burton's phone that evening, but they eventually ceased as [Mr.] Burgess gave Duke/[Mr.] Burton [Victim's] phone number. During the remainder of the night, all of the calls placed were between [Victim] and Duke. The last phone call on Duke/[Mr.] Burton's cellphone was at 1:09 a.m. on May 5th, when call activity ceased until approximately 7:00 a.m.

Det. Neal also interviewed Appellant in connection with the shooting of [Victim]. Between the first interview, which was recorded by audio and second interview, which was not recorded, he changed his story. Appellant initially said that he left [Mr.] Burgess' house with [Mr.] Burton, dropped him off and picked him up then spent several hours at the Hollywood casino. His second version of events had him dropping off [Mr.] Burton with another man named Roni, going back to his own house to shower and smoke marijuana before picking up [Mr.] Burton and going to the casino.

Detective Donald Heffner of the HBP assisted Det. Neal by reviewing [Mr.] Burton/Duke's cellular phone historical data records for May 4 and May 5, 2009. More particularly, he reviewed the cell tower data to determine

which cell towers were utilized by Duke's cellphone within a 13.8 mile radius, during the timeframe surrounding the murder. Det. Heffner analyzed the data and mapped the cell tower utilization locations and determined that all of the calls made from his phone, around 1:00 a.m. on May 5, 2009, hit cell towers within .5 miles to 2 miles of the crime scene. Additionally, Trooper Greg Kohl ("Trooper Kohl") of the PSP reviewed the records of Appellant's "action card," a type of rewards card one may get for use at the Hollywood Casino. The purpose of the card is to track an individual's gaming history for reporting and promotional purposes. The record which Trooper Kohl analyzed was dated May 12, 2010. Trooper Kohl testified that upon review of Appellant's records, unless he did not use his card during a particular visit, the last three uses of Appellant's actions card took place on May 23, 2009, April 18, 2009[,] and April 16, 2009.

(Trial Court Opinion, filed May 19, 2014, at 2-10) (internal citations and footnotes omitted).

Procedurally, police arrested Appellant on May 7, 2010 in connection with Victim's death. While in custody, police issued Appellant **Miranda**[2] warnings, and Appellant made a statement to police. The Commonwealth charged Appellant with criminal homicide, criminal conspiracy, persons not to possess firearms, firearms not to be carried without a license, and REAP. On April 26, 2011, Appellant filed a motion to suppress his statement. The court held a suppression hearing on May 31, 2011, and denied Appellant's motion on June 20, 2011. Appellant proceeded to a jury trial on January 23, 2012. On January 27, 2012, the jury convicted Appellant of first-degree

---

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

murder, criminal conspiracy, and REAP.[3]  The court sentenced Appellant on April 23, 2012, to life imprisonment for his first-degree murder conviction, twenty (20) to forty (40) years' imprisonment for his criminal conspiracy conviction, and twelve (12) to twenty-four (24) months' imprisonment for his REAP conviction; the court imposed all sentences concurrently.  On May 2, 2012, Appellant timely filed post-sentence motions, which the court denied on August 27, 2012.  On September 24, 2012, Appellant timely filed a notice of appeal.

On October 17, 2012, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant timely filed on November 5, 2012, challenging, *inter alia*, the sufficiency of the evidence and the denial of his suppression motion. Nevertheless, on December 18, 2012, the court issued a Rule 1925(a) opinion, stating Appellant waived all issues for appellate review because he failed to follow the court's procedure for ordering trial transcripts; so the court declined to address the merits of any of Appellant's claims.  On December 9, 2013, this Court, having determined the relevant transcripts were made part of the certified record, remanded the case for issuance of a supplemental Rule 1925(a) opinion addressing Appellant's non-suppression

_____

[3] Prior to trial, the Commonwealth withdrew the firearms not to be carried without a license charge; the court severed the persons not to possess firearms charge.

issues presented in Appellant's Rule 1925(b) statement; this Court also directed the suppression court to issue findings of fact and conclusions of law regarding its suppression ruling.

Appellant raises the following issues for our review:

> DID THE COMMONWEALTH PRESENT SUFFICIENT EVIDENCE TO FIND APPELLANT GUILTY OF FIRST DEGREE MURDER, CRIMINAL CONSPIRACY, AND [REAP] BEYOND A REASONABLE DOUBT?
>
> WAS THE EVIDENCE SUFFICIENT TO FIND APPELLANT GUILTY OF FIRST DEGREE MURDER, CRIMINAL CONSPIRACY, AND [REAP] ON THE BASIS THAT APPELLANT AND RONALD BURTON, HIS CODEFENDANT, WERE ACCOMPLICES?
>
> DID THE COURT ERR, IN RULINGS BOTH PRETRIAL AND AT TRIAL, BY FAILING TO SUPPRESS APPELLANT'S INCULPATORY RECORDED STATEMENT TO THE POLICE ON THE BASIS THAT THE STATEMENT WAS TAKEN AT A TIME WHEN APPELLANT WAS UNDER THE INFLUENCE OF A CONTROLLED SUBSTANCE AND, THEREFORE, WAS UNABLE TO GIVE A KNOWING AND INTELLIGENT WAIVER OF HIS RIGHT TO COUNSEL UNDER **MIRANDA** AND/OR GIVE A KNOWING, VOLUNTARY, AND FREE STATEMENT TO THE POLICE?
>
> DID THE COURT ERR BY REFUSING TO SUPPRESS AND/OR EXCLUDE PORTIONS OF APPELLANT'S RECORDED STATEMENT WHICH PERMITTED THE JURY TO HEAR EVIDENCE OF OTHER CRIMES, WRONGS, OR ACTS WHEN THOSE PORTIONS OF HIS STATEMENT SHOULD HAVE BEEN EXCLUDED FROM THE TRIAL UNDER PA. RULE[S] OF EVIDENCE…403 AND 404(B), BECAUSE THE PROBATIVE VALUE OF THE INCLUSION OF THOSE STATEMENTS DID NOT OUTWEIGH THE DANGER OF UNFAIR PREJUDICE TO APPELLANT, CONFUSION OF THE ISSUES, OR MISLEADING THE JURY?

(Appellant's Brief at 3).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Richard A. Lewis, we conclude Appellant's first two issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of those questions. (*See* Trial Court Opinion, filed May 19, 2014, at 10-17) (finding: **(1)** evidence established Appellant was with his co-defendant, Mr. Burton, before and after murder, at time when Mr. Burton was supposed to meet Victim to rectify drug deal that "went wrong"; Mr. Burton was in touch with Victim by cell phone multiple times around and up to time of shooting; eyewitnesses placed Mr. Burton and another man in alley heading in direction of crime scene, with guns, arriving and fleeing scene in dark colored SUV; evidence showed Appellant generally operates black SUV; strong circumstantial evidence indicated Appellant was second man whom eyewitnesses observed in alley in pursuit of Victim immediately before shots were fired; Commonwealth presented sufficient evidence to sustain Appellant's first-degree murder conviction; additionally, Appellant's conduct with Mr. Burton amounted to agreement to commit or aid in unlawful act sufficient to sustain Appellant's conspiracy conviction; further, Commonwealth presented evidence that at least ten shots were fired at scene of crime on city street nearby residential apartment building, sufficient to sustain Appellant's REAP conviction; **(2)** circumstantial evidence established Appellant was with Mr. Burton at crime scene on night in

question, and was one of two men eyewitnesses observed pursue Victim before shots were fired; perpetrators ran from crime scene after shooting and fled in dark colored SUV, which is type of vehicle Appellant generally operates; jury reasonably inferred Appellant drove with Mr. Burton to crime scene and pursued Victim with Mr. Burton; Victim was shot in vital organ— his chest; evidence showed Appellant facilitated crime; Appellant's challenge to sufficiency of evidence based on theory of accomplice liability fails). Therefore, with respect to Appellant's first and second issues on appeal, we affirm on the basis of the trial court's opinion.

In his third issue, Appellant explains he smoked "a few blunts" of marijuana shortly before police apprehended him. Appellant argues his use of marijuana impaired his cognitive functions at the time he gave a statement to police. Appellant maintains the Commonwealth must establish by a preponderance of the evidence that Appellant had enough cognitive awareness to understand his *Miranda* warnings and choose to waive his rights. Appellant asserts the Commonwealth failed to meet this burden because Detective Heffner did not ask Appellant whether he had consumed drugs until a majority of the interview had already occurred. Appellant emphasizes Detective Neal admitted at the suppression hearing that marijuana impedes the ability to make decisions. Appellant concludes his consumption of marijuana rendered involuntary his waiver of *Miranda* rights and subsequent statement to police, and this Court should have suppressed

Appellant's statement. We disagree.

Preliminarily, we observe Appellant has the responsibility "to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa.Super. 1999). "An appellate court is limited to considering only those facts that have been duly certified in the record on appeal." *Commonwealth v. Powell*, 598 Pa. 224, 251-52, 956 A.2d 406, 423 (2008) (holding appellant waived challenge to admissibility of autopsy photograph where he failed to include photograph at issue in certified record). *See also Commonwealth v. Spotti*, 2014 WL 2535265 (Pa.Super. June 5, 2014) (*en banc*) (explaining this Court may not review that which appellant, despite bearing burden to do so, has failed to remit within certified record; appellant waived challenge to sufficiency of evidence regarding whether victim sustained serious bodily injury where he failed to include victim's pertinent medical records in certified record).

Instantly, Appellant failed to ensure the statement at issue was included in the certified record. The notes of testimony from the suppression hearing refer to Appellant's statement generally and quote portions of the statement but do not recite verbatim Appellant's entire statement to police, which the record indicates was lengthy. Nevertheless, Appellant's failure to include his statement in the certified record does not

hamper our review of this suppression issue. Without the actual statement we can still resolve Appellant's claim by reviewing the applicable law, the suppression hearing transcript, and the suppression court's findings of fact and conclusions of law. Thus, we decline to find Appellant's third issue waived on appeal.

Our standard of review of a court's suppression ruling is:

> [W]hether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Cruz*, 71 A.3d 998, 1002-03 (Pa.Super. 2013), *appeal denied*, ___ Pa. ___, 81 A.3d 75 (2013).

"It is the Commonwealth's burden to establish whether [a defendant] knowingly and voluntarily waived his *Miranda* rights." *Commonwealth v. Johnson*, 615 Pa. 354, 376, 42 A.3d 1017, 1029 (2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1795, 185 L.Ed.2d 818 (2013). To meet this burden, "the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Id.*

Importantly:

> [T]he fact that an accused [is intoxicated] does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental

- 13 -

capacity at the time of giving his statements to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make [a statement] inadmissible, but only goes to the weight to be accorded to it.

The Commonwealth is required to show voluntariness only by a preponderance of the credible evidence.

*Commonwealth v. Milligan*, 693 A.2d 1313, 1316-17 (Pa.Super. 1997) (quoting *Commonwealth v. Smith*, 447 Pa. 457, 460-61, 291 A.2d 103, 104 (1972)). "[I]ntoxication is a factor to be considered, but it is not sufficient, in and of itself to render [a statement] involuntary." *Commonwealth v. Culberson*, 467 Pa. 424, 427, 358 A.2d 416, 417 (1976). "[T]his standard is equally applicable to those instances where an accused was allegedly under the influence of drugs or narcotics at the time of his interrogation by police officials." *Id.* (holding appellant's use of marijuana before questioning did not render his waiver of *Miranda* rights involuntary; evidence at suppression hearing showed appellant appeared normal, alert, and responsive to questions, and gave confession voluntarily).

Instantly, the suppression court reasoned:

We are satisfied that the record proves that, although he admitted to smoking marijuana that day, [Appellant] possessed sufficient cognitive awareness to effectively waive his *Miranda* rights. Detective Neal testified at the suppression hearing that [Appellant] stated that he smoked marijuana beginning at 10:30 a.m. on the day of the arrest. Detective Neal testified that [Appellant] did not appear to be under the influence during the interview. [Appellant] exhibited his ability to comprehend the questions and the significance of his answers by correcting

- 14 -

statements made by Detective Neal, and by carefully phrasing responses in an effort to avoid self-incrimination.

Accordingly, we properly found that [Appellant] voluntarily waived his *Miranda* rights such that no basis existed for suppression of his statement.

(Suppression Court Opinion, filed June 19, 2014, at 4) (internal citations omitted).

Further, Detective Neal testified at the suppression hearing that he read Appellant his *Miranda* rights twice before Appellant waived his rights and gave a statement. Detective Neal stated Appellant had no difficulty understanding the *Miranda* warnings, he knew exactly what the police wanted to talk to him about before questioning began, and he did not appear to be under the influence of alcohol or drugs during questioning. In fact, Detective Neal said Appellant was calm and cooperative and gave specific answers to the questions asked. Additionally, Detective Neal explained Appellant stopped and corrected some of the facts, which demonstrated Appellant understood the situation. The Commonwealth established by a preponderance of the evidence that Appellant had sufficient mental capacity at the time of his statement to know what he was saying and voluntarily intended to say it. The record belies Appellant's contention that his statement to police was involuntary. *See Culberson, supra*; *Milligan, supra*. Thus, the court properly denied Appellant's suppression motion on this ground, and Appellant's third issue merits no relief.

- 15 -

In his fourth issue, Appellant explains he made certain admissions in his statement to police: (a) Appellant carries a revolver; (b) he robbed drug dealers in the past; and (c) Appellant set up robberies in the past to help his co-defendant, Mr. Burton. Appellant argues these specific portions of his statement were irrelevant to the present case because the Commonwealth had not charged him with robbery, conspiracy to commit robbery, or felony murder. Appellant suggests his admission to carrying a revolver is also irrelevant because the casings recovered from the crime scene cannot be ejected from a revolver, which essentially ruled out use of a revolver during the murder. Appellant maintains admission of these specific portions of his statement was improper, as they showed nothing but a propensity to commit crimes, and other bad acts. Appellant contends the court should have suppressed these comments, because the danger of unfair prejudice far outweighed the probative value of their admission. Appellant concludes the court erred in failing to suppress the challenged portions of his statement. We cannot agree.

Instantly, Appellant failed to include in the certified record a copy of his statement to police. In our December 9, 2013 remand order, this Court noted Appellant's statement to police was missing from the certified record. Therefore, Appellant was on notice that the absence of his statement could hamper appellate review. The record shows Appellant's statement was admitted as an exhibit at both the suppression hearing and at trial, but the

statement was not read into evidence at either proceeding. As a result, we are unable to verify the suppression court's findings of fact and conclusions of law concerning the challenged portions of Appellant's statement. Appellant refers generally to the portions of his testimony he sought to exclude, but we simply cannot review those statements in their proper context without his entire statement. Appellant's failure to include his statement to police in the certified record precludes a complete and judicious assessment of this issue; thus, Appellant's fourth issue is waived. ***See Powell, supra***; ***Spotti, supra***; ***Wint, supra***. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/2014

Circulated 07/22/2014 03:15 PM



ORIGINAL

| COMMONWEALTH OF PENNSYLVANIA | : IN THE COURT OF COMMON PLEAS |
| | : DAUPHIN COUNTY, PENNSYLVANIA |
| | : |
| v. | : CP-22-CR-4623- 2010 |
| | : (1682 MDA 2012) |
| | : |
| TYRONE LAMONT WILLIAMS | : CHARGES: MURDER, ET AL |

## MEMORANDUM OPINION

Defendant/Appellant, Tyrone Lamont Williams ("Appellant" or "Williams") appeals this Court's Judgment of Sentence entered April 23, 2012. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

The instant opinion is written pursuant to the Pennsylvania Superior Court's order dated December 9, 2013, wherein the case was remanded for the preparation of a supplemental opinion.[1] Pursuant to Pa.R.A.P. 1925(a), this Court had filed its trial court opinion in this case on December 18, 2012.[2] We had concluded that Defendant had waived all appellate issues for failure to comply with the procedure to order trial transcripts although he had represented in his Pa.R.A.P. 1925(b) statement that the entire trial transcript would be required for sufficient review of two of his four asserted errors on appeal. Subsequently, on or about April 1, 2013, almost six months after the filing of the Notice of Appeal, Appellant made the arrangements to have the trial transcript produced and filed with the Clerk of Courts. Upon review of the file, the

---

[1] 1682 MDA 2012.
[2] This Court herein incorporates by reference the Procedural History set forth in the December 18, 2012 Trial Court opinion filed in this matter.

5-24

Superior Court concluded that, since all relevant transcripts were in the certified record, a remand was appropriate to have this Court review Appellant's claims of error and provide a supplemental trial court opinion. This Court has been directed to address Appellant's non-suppression issues raised in his 1925(b) statement which are as follows:

1.     Did the trial court err in ruling that the Commonwealth presented sufficient evidence to find Defendant guilty of the charges of first degree murder, criminal conspiracy, and recklessly endangering another person beyond a reasonable doubt and if the evidence was sufficient to find Defendant guilty of first degree murder, criminal conspiracy, and recklessly endangering another person on the basis that Defendant and Ronald Burton, his codefendant, were accomplices?

2.     Did the trial court abuse its discretion in refusing to grant Defendant's post trial [sic] motions and therefore refuse to grant Defendant a new trial on the grounds that the verdicts of guilty for the crime of first degree murder, criminal conspiracy, and recklessly endangering another person, was [sic] so contrary to the weight of the evidence presented as to shock one's sense of justice?

## FACTUAL BACKGROUND

Brandon Granthon ("Granthon") was shot in the chest and killed on May 5, 2009 at approximately 1:10 a.m. Officer Garrett Miller ("Officer Miller") of the Harrisburg Bureau of Police ("HBP") was dispatched to the corner of Mulberry and Crescent Streets in Harrisburg City to investigate a report of shots fired. (Notes of Testimony, Trial at 27-28).[3] The area is known for high crime and drug traffic. (N.T. at 262). Officer Miller found Granthon lying on the sidewalk in front of the McFarland Building apartments, on his back, with a gunshot wound to the chest. (N.T. at 28-29; 262). Miller stated that Granthon was dressed in all black including black gloves, and a .40 caliber handgun was

---

[3] Hereinafter "N.T."

2

on the ground to the left of him. (Id.) Officer Miller described the scene as initially chaotic as several individuals were in the immediate area. (Id.) Granthon was loaded into an ambulance for purposes of transport to the hospital for treatment along with Officer Jeffrey Cook ("Officer Cook") of the HBP. (N.T. at 29).

While in the ambulance, the EMS personnel had to cut off Granthon's pants to administer medical treatment which caused a bag to fall out of the pants to the floor. (N.T. at 23-25). Officer Cook suspected that the bag contained crack cocaine, so he gave it to Officer Miller who subsequently provided it to the forensics officer. (N.T. at 23-25; 29-30). After arriving at the hospital emergency room, the ER physician pronounced Granthon dead at 1:35 a.m. (N.T. at 25).

The substance in the baggy found on Granthon's body was tested at the PSP Crime Lab by forensic scientist Nicole Blascovich ("Ms. Blascovich"). (N.T. at 118). Ms. Blascovich determined that the substance contained in the baggy found on Granthon's body was 8.2 grams of crack cocaine. (N.T. 122-123) She also tested a substance suspected to be cocaine which had been obtained by Officer Mark McNaughton ("Officer McNaughton") of the HBP when he conducted a search of Granthon's apartment pursuant to a warrant. (N.T. at 94; 123-124). Ms. Blascovich determined that the substance in the second baggie was crack cocaine weighing 65/100ths of a gram. (N.T. at 123-124).

Dr. Wayne Ross, a forensic pathologist for the Dauphin County Coroner's Office performed an autopsy on the body of Brandon Granthon. (N.T. at 57-59). Upon

examination of the body, he discovered hole in Granthon's chest consistent with a gunshot wound. Upon further examination, Dr. Ross determined that a gunshot went into his chest entering the 5th rib on the left side, broke the rib, and went through the liver, heart and lung. (N.T. at 62). Dr. Ross stated that he found a bullet in blood that was in the lung. (Id.) Dr. Ross concluded that, as there was no soot or residue on the outside of Granthon's hoodie, the wound was a "distant gunshot wound" and the "path relative to his body was going front to back, left to right, and upward." (Id.) Dr. Ross concluded within a reasonable degree of medical certainty that the cause of Granthon's death was a gunshot wound to the chest and the manner of death was homicide. (N.T. at 65-66). Upon evaluation of the position in which Granthon was found and the path of the bullet within the body, it was Dr. Ross' opinion that when Granthon was shot he was pulling his body backwards in some manner, lying on the ground or the shooter was pulling backward and running. (N.T. at 66).

On May 4, 2009, Brandon Granthon called Preston Burgess ("Mr. Burgess"), who is also known as "Pepsi," and asked him set up a deal to purchase an ounce of crack cocaine. (N.T. at 136; 164). Mr. Burgess had known Granthon for several months as he had been Burgess' drug dealer. (N.T. at 135). Burgess contacted another drug dealer he knew, an individual nicknamed "Duke", to set up the sale for Granthon. (N.T. at 136). Duke later arrived to Burgess' house, parked outside in his truck and Granthon went out to consummate the drug deal. (N.T. at 136-139). When Granthon reentered Burgess' house, he stated that he thought that the drugs were "light," meaning less than the ounce he had agreed upon. (N.T. at 139-140). To remedy the situation,

4

Burgess called Duke who agreed to come back to Burgess' house, later in the evening, to return Granthon's money in exchange for the drugs. (N.T. at 140-141).

At the meeting time, Granthon returned to Burgess' house. Mr. Burgess described him as being dressed in all black including his pants, shirt and gloves, and acting uncomfortable or skittish. (N.T. at 141). Duke did not show up when expected, so Granthon left. (N.T. at 141-143). Later, when Duke arrived at Burgess' house, they arranged for Granthon and Duke to meet at Kiwi's Bar on 13th and Derry Streets to make the exchange and Burgess gave Granthon's cellphone number to Duke so the two of them could handle the situation themselves. (N.T. at 143-144). When Duke was at Mr. Burgess' house the second time that day, Appellant, who Burgess, and later police, knew to be called "Slim," unexpectedly arrived first, a minute or two before Duke. (N.T. 145; 274). The police first learned that Appellant was at Burgess' house on the night of the murder during Mr. Burgess' testimony at the preliminary hearing for charges filed against Ronald Burton, who is also known as "Duke". (N.T. at 271). Mr. Burgess had known Appellant from previously buying drugs from him and, when Williams would sell to Burgess, he would come to Burgess' house in a black SUV. (N.T. at 147). Of note is that Appellant had been stopped by police for a traffic violation, in a black Ford Expedition SUV, in May 2010. (N.T. at 271-272).

Duke and Williams left Burgess' house, on foot, and walked toward the corner of Sylvan Terrace. (N.T. at 146). Mr. Burgess testified that after they left, his girlfriend returned home and they immediately went to a store called the "All Nighter" for cigarettes. While at the All Nighter, within approximately ten (10) minutes of Appellant

5

and Duke leaving, they heard several gunshots fired, one after another. (N.T. at 146-147). From a police photo array, Mr. Burgess identified Ronald Burton as the person he knew as Duke. (N.T. at 166).

On the night of the murder, two individuals, Greta McAllister ("Ms. McAllister") and Jeffrey Lynch ("Mr. Lynch"), were in an alley smoking crack cocaine between Hummel Avenue and Mulberry Street. (N.T. at 103-106; 170). Both of them testified that they saw two individuals dressed in black with hoods on get out of a dark colored SUV and walk quickly through the alley toward Mulberry Street. (N.T. at 103-106; 170-171). Mr. Lynch did not see them carrying guns, but Ms. McAllister did. (N.T. at 105; 178). Mr. Lynch stated that he recognized one of the men as an individual nicknamed "Philly" from whom he had previously bought cocaine. (N.T. at 170-171). Mr. Lynch testified that he heard the man he knew as "Philly" say "hurry up" as the men crouched by a parked car and a light pole at the end of the alley. (N.T. at 172). Lynch then heard one of the men say "there he go" at the same time he saw another man walking on the opposite side of Mulberry Street. Mr. Lynch said that once the man on the opposite side of Mulberry was out of his sight, the two men in the alley where he was located ran toward the man across the street. (N.T. at 173). Both Ms. McAllister and Mr. Lynch were headed in the other direction, still in the alley, toward Hummel, when shots rang out. (N.T. 107-108; 173-174). Mr. Lynch stated that at least 10 shots, of two different caliber bullets, were fired. (N.T. 174). Ms. McAllister and Mr. Lynch testified that, after the shots were fired, the men ran back down the alley, toward Hummel Avenue and got back into the dark colored SUV. (N.T. 107-109; 174). Later,

while being interviewed by Detective Christopher Krokos ("Det. Krokos") of the HBP, Mr. Lynch was able to identify "Philly" from police photos as Ronald Burton. (N.T. 174-175; 222-225).

At the murder scene, HBP forensic investigator Karen Lyda ("Officer Lyda") recovered four (4) spent .45 caliber shell casings on the south side of Mulberry Street, grouped together near the location where Granthon's body was found. (N.T. at 74-76). An additional grouping of five (5) spent .45 caliber shell casings was found at the same intersection, across Crescent Street. (N.T. at 78-81). Officer Lyda also recovered a live .40 caliber bullet and a .40 caliber shell casing. (Id.) Other evidence obtained at the scene included a mutilated bullet jacket, a cellphone and a left sneaker. (N.T. at 78, 80). Officer Lyda later learned from other investigating officers that a casing was jammed in the recovered .40 caliber hand gun and there were 3 unfired cartridges in the magazine. (N.T. at 82).

During the trial, Corporal Mark Garrett ("Cpl. Garrett") of the Pennsylvania State Police ("PSP"), Bureau of Forensic Sciences processed the firearms evidence submitted by the HBP and presented expert testimony on firearm and tool mark examination. (N.T. at 35-56). The HBP provided Cpl. Garrett with a Beretta semiautomatic .40 caliber pistol, a magazine with three (3) undischarged Remington .40 caliber cartridges, one (1) discharged mutilated bullet jacket, one (1) discharged Remington .40 caliber Smith and Wesson cartridge and five (5) discharged Winchester .45 automatic cartridge cases. (N.T. at 42-45). After examination and forensic testing of these items, Cpl. Garrett concluded that the five (5) discharged .45 caliber cartridges were all discharged

from the same gun, but were definitely not discharged from the .40 caliber Beretta handgun found by Granthon at the crime scene. (N.T. at 46-47).

On August 10, 2009, a 2000 gold Cadillac Deville was stopped by police while Appellant was operating the vehicle. (N.T. at 242). In furtherance of the investigation, on August 13, 2009, Detective Rodney Shoeman ("Det. Shoeman") of the HBP was asked to obtain and execute a search warrant for the vehicle operated by Appellant. (N.T. at 232; 242). Det. Shoeman had been informed that Ronald Burton had been seen in that particular vehicle. (N.T. at 242). Lead investigator Detective Ryan Neal ("Det. Neal") had determined that Ronald Burton was also known in the drug community as "Duke" and "Philly" based on photo identification by Jeffrey Lynch and Preston Burgess. (N.T. at 261; 277-278). During the search, plastic bags of clothing and toiletry items were found in the trunk of the car along with a green plastic storage tote. (N.T. at 233-234). In the green storage tote, Detective Shoeman found documents belonging to Ronald Burton. (N.T. at 235-236). The documents which were recovered were a 2008 W-2 income reporting form, a letter and a PPL electric utility bill all in the name of Ronald Burton. (N.T. at 235-236).

Det. Neal reviewed Granthon's cellphone that had been recovered at the scene of the murder and, in the address book, found a number that he confirmed had belonged to Ronald Burton/Duke. (N.T. at 263-264). By way of search warrant, Det. Neal was able to obtain and review the records for Duke's phone number for May 4 and May 5, 2009. (N.T. at 263-264). From the records, Det. Neal reviewed the particular cellphone numbers and call history that belonged to Duke/Burton and Burgess/Pepsi.

8

(N.T. at 264-265) Upon review of the records for the interactions between Burton, Burgess and Granthon on the night of the murder, Det. Neal determined that multiple calls were made from Burgess' phone to Duke/Burton's phone that evening, but they eventually ceased as Burgess gave Duke/Burton Brandon Granthon's phone number. (N.T. at 266-267). During the remainder of the night, all of the calls placed were between Granthon and Duke. (N.T. at 265-268). The last phone call on Duke/Burton's cellphone was at 1:09 a.m. on May 5th, when call activity ceased until approximately 7:00 a.m. (N.T. at 268-269).

Det. Neal also interviewed Appellant in connection with the shooting of Granthon. Between the first interview, which was recorded by audio and second interview, which was not recorded, he changed his story. Appellant initially said that he left Burgess' house with Burton, dropped him off and picked him up then spent several hours at the Hollywood casino. His second version of events had him dropping off Burton with another man named Roni, going back to his own house to shower and smoke marijuana before picking up Burton and going to the casino. (N.T. at 278-281).

Detective Donald Heffner of the HBP assisted Det. Neal by reviewing Burton/Duke's cellular phone historical data records for May 4 and May 5, 2009. (N.T. at 324-325). More particularly, he reviewed the cell tower data to determine which cell towers were utilized by Duke's cellphone within a 13.8 mile radius, during the timeframe surrounding the murder. (N.T. at 327-328). Det. Heffner analyzed the data and mapped the cell tower utilization locations and determined that all of the calls made from his phone, around 1:00 a.m. on May 5, 2009, hit cell towers within .5 miles to 2

9

miles of the crime scene. (N.T. at 330). Additionally, Trooper Greg Kohl ("Trooper Kohl") of the PSP reviewed the records of the Appellant's "action card," a type of rewards card one may get for use at the Hollywood Casino. The purpose of the card is to track an individual's gaming history for reporting and promotional purposes. (N.T. at 312-313). The record which Trooper Kohl analyzed was dated May 12, 2010. (N.T. at 314). Trooper Kohl testified that upon review of Appellant's records, unless he did not use his card during a particular visit, the last three uses of Appellant's action card took place on May 23, 2009, April 18, 2009 and April 16, 2009. (N.T. at 314).

## **DISCUSSION**

After a jury trial held January 23 through January 27, 2012, Appellant was convicted of homicide – murder in the first degree,[4] criminal conspiracy,[5] and recklessly endangering another person.[6,7] He now challenges his conviction by contending that the evidence presented at trial was not sufficient to prove the charges beyond a reasonable doubt. Appellant's first statement of error also challenges the sufficiency of the evidence which formed the basis of the jury's finding of guilt based on the fact that he and Ronald Burton were accomplices. Although presented in one issue, for clarity, this Court will address each issue separately. For the reasons set forth below, this Court

---

[4] 18 Pa.C.S. §2502.
[5] 18 Pa.C.S. §903.
[6] 18 Pa.C.S. §2705.
[7] Appellant was also charged with Persons Not to Possess a Firearm (18 Pa.C.S. §6105(a)(1)) and Firearms- Carrying Without a License (18 Pa.C.S. §6106). However, on January 23, 2012, the Persons Not to Possess Charge was severed from the remaining charges and the Firearms charge was dismissed. (N.T. at 339).

10

finds that the evidence of record is more than sufficient to support the guilty verdicts and to support a finding of accomplice liability.

When reviewing a case where the sufficiency of the evidence produced is contested, the test is whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to prove beyond a reasonable doubt that the defendant is guilty of the crime of which he has been convicted. Commonwealth v. Johnson, 727 A.2d 1089, 1092 (Pa. 1999). It is well established that circumstantial evidence and inferences to be drawn therefrom can be sufficient to convict a defendant of a crime under the more stringent standard of proof beyond a reasonable doubt. Commonwealth v. Breakiron, 571 A.2d 1035 (Pa. 1990) *cert. denied,* 111 S. Ct. 224 (1990); Commonwealth v. Aquado, 760 A.2d 1181, 1184-85 (Pa. Super. 2000) (*citing* Commonwealth v. Harper, 403 A.2d 536, 538 (Pa. 1979)). Furthermore, in Commonwealth v. Seibert, the Superior Court set forth the following:

> "The facts and circumstances established by the
> Commonwealth need not be absolutely incompatible
> with the defendant's innocence, but the question of any
> doubt is for the fact-finder unless the evidence is so weak
> and inconclusive that, as a matter of law, no probability of
> fact can be drawn from the combined circumstances."

Commonwealth v. Seibert, 622 A.2d 361, 363 (Pa. Super. 1993).

Criminal homicide and first degree murder are defined as follows:

§ 2501. Criminal homicide

**(a) Offense defined.--**A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.
**(b) Classification.--**Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter. 18 Pa.C.S. § 2501;

§ 2502. Murder

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. 18 P.C.S. § 2502.

"Evidence is sufficient to sustain a conviction of first-degree murder when the Commonwealth establishes that (1) a person was unlawfully killed; (2) the person accused did the killing; and (3) the accused acted with specific intent to kill. An intentional killing is one committed by means of poison, lying in wait, or by any other kind of willful, deliberate, and premeditated action. The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." Commonwealth v. Rega, 593 Pa. 659, 680, 933 A.2d 997, 1009 (2007)(internal citations omitted); 18 Pa.C.S. § 2502(d). The period of reflection required to formulate the intent to kill may be very brief. Commonwealth v. Drumheller, 808 A.2d 893, 910 (Pa. 2002).

Review of the record reveals that the evidence from which the jury drew its conclusions included the testimony of two eyewitnesses, Greta McAllister and Jeffrey Lynch, who saw two men dressed all in black come out of a dark SUV and proceed down an alley toward Mulberry Street, the location of the murder. Mr. Lynch recognized one man as a drug dealer named "Philly" who he later positively identified as Ronald Burton. Ms. McAllister stated that the men were carrying guns and both testified that shortly after seeing them, they heard several gunshots. Prior to the

gunshots, Mr. Lynch stated that he saw the two men hiding while watch another man dressed in black walk down Mulberry Street. He heard one of the men say "there he go" before they ran down the street. After the shots rang out, McAllister and Lynch, who were further down the alley, saw the same two men run past them and leave in the same dark SUV. The Coroner's testimony confirmed that Granthon died in a homicide from a gunshot wound to the chest.

The record also includes testimony placing Appellant with Duke/Burton at Preston Burgess' house shortly before the murder. Burgess stated that both men left together on foot moving in the direction of the area of the murder. Both men were at Burgess' house at a time when Duke/Burton was supposed to meet with Granthon to rectify a drug deal in which Granthon felt he had been shorted cocaine. The evidence also shows many cellphone calls between Duke/Burton and Granthon up to the time of the murder, with the last call of the evening being made at 1:09 a.m. Of note is Burgess' testimony that when he had previous drug transactions with Appellant, he always drove to Burgess' house in a dark SUV and additionally, Appellant had been involved in a traffic stop in 2010 driving a black Ford Expedition.

Appellant's statements to the police place him with Duke/Burton before and after the time of the murder. Appellant admitted to being with Duke/Burton at Burgess' house before the time of the murder, which happened to be a time when Duke was going to meet with Granthon. Then Appellant told the police that he dropped off Duke and later picked him up to go to the casino.

As this Court is required to view the evidence in a light most favorable to the verdict winner, herein the Commonwealth, we find that the evidence is clearly sufficient to permit the jury to draw the inference that the elements of the crime of first degree murder have been established beyond a reasonable doubt. The evidence establishes that Appellant was with Burton before and after the murder, at a time when Burton was meeting Granthon about a drug deal that went wrong. Burton was in touch with Granthon by cell phone multiple times around and up to the time of the shooting. Eyewitnesses place Burton and another man in an alley heading in the direction of the murder location, with guns, arriving and leaving in a dark SUV. This court finds that the evidence was sufficient to permit the jury to conclude guilt of first degree murder.

Appellant also challenges the sufficiency of the evidence with respect to the charge of conspiracy to commit murder. Under the statute, in order to be found guilty of conspiracy, the Commonwealth must establish that:

> (a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime. 18 Pa.C.S.A. § 903.

> Generally, a conspiracy conviction requires proof of:

> (1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator and (3) an overt act in furtherance of the conspiracy. Although the existence of an agreement is an essential element of conspiracy, it is generally difficult to prove an explicit or formal agreement. Therefore, such an agreement may be established

14

inferentially by circumstantial evidence, i.e. the relations, conduct or circumstances of the parties or overt acts on the part of co-conspirators. Commonwealth v. Spotz, 552 Pa. 499, 523-24, 716 A.2d 580, 592 (1998)(internal citations omitted).

Brandon Granthon was murdered around the time when Ronald Burton had left Preston Burgess' house to meet him due a drug deal that had gone wrong. Appellant was admittedly at Burgess' house at the same time, left with Burton and told police that he was with Burton before and after the time of the murder. As stated above, the strong circumstantial evidence pointed to Appellant as the person witnessed by Lynch and McAllister in the alleyway immediately before shots were fired. Additionally, Lynch testified that he saw both of the men duck behind a car and a light pole while watching for a third man coming down the street. The two men ran from the shooting and left in a dark SUV which Burgess stated was the type of vehicle driven by Appellant and which is the type of vehicle he was later driving while stopped by police. The evidence presented at trial was sufficient to permit an inference that Appellant's conduct with Burton throughout the entire episode amounted to an agreement to commit or aid in an unlawful act.

Appellant was also convicted of recklessly endangering another person. A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S.A. § 2705. Once again, this Court has already found that the evidence was sufficient to establish Appellant's involvement in the murder of Granthon. Further, the Commonwealth clearly proved that at least ten (10) shots were fired, which resulted in Granthon being murdered by being shot in the chest and, the episode took

15

place on a city street nearby a residential apartment building. Officer Miller testified that when he arrived on the scene there were several people in the immediate area which was in front of a residential building. This Court finds that the evidence is more than sufficient for the jury to infer that a gun battle in front of a residential building would place a person in danger of death or bodily injury.

Next, this Court will address Appellant's claim of error in finding that he was Burton's accomplice. The trial court judge instructed the jury on accomplice liability. (N.T. at 365-369). Caselaw in Pennsylvania provides:

> "the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." Commonwealth v. Markman, 591 Pa. 249, 916 A.2d 586, 597 (2007). The amount of aid may be insubstantial, so long as such aid was offered to the principal as assistance in committing the crime. Id. at 597–98. Nevertheless, "simply knowing about the crime or being present at the scene is not enough." Id. at 598. Rather, and specific to first degree murder, the evidence must prove that the defendant "possessed the requisite specific intent to kill, even if [the jury] determined that he was not the person who actually pulled the trigger." Commonwealth v. Johnson, R., 572 Pa. 283, 815 A.2d 563, 580 (2002). Finally, specific intent to kill may be inferred by the use of a deadly weapon upon a vital organ of the body. Commonwealth v. Spell, 611 Pa. 584, 28 A.3d 1274, 1278 (2011). Commonwealth v. Murray, 83 A.3d 137, 151 (Pa. 2013).

In this matter, sufficient circumstantial evidence was presented to establish that Appellant was with Burton in the alleyway that night. As stated above, the strong circumstantial evidence pointed to Appellant as the person witnessed by Lynch and McAllister in the alleyway immediately before shots were fired. Additionally, Lynch testified that he saw both of the men duck behind a car and a light pole while watching

for a third man coming down the street and one of them say "there he go." This is the type of action which the jury could infer as facilitating the crime. The two men ran from the shooting and left in a dark SUV which Burgess stated was the type of vehicle driven by Appellant and which is the type of vehicle he was later driving while stopped by police. Even if Appellant was not the shooter, which we will likely never know, the jury could have easily determined that Appellant drove Burton there and walked down an alley and, according to Ms. McAllister with guns drawn. Granthon was shot in the chest, a location of several vital organs. The inference is that intended which and Appellant was involved with or at least facilitated the commitment of the crime which resulted in the death of another human being.

Finally, Appellant claims that this Court abused its discretion in denying his post-sentence motion for a new trial because the verdicts rendered on all charges were so far against the weight of the evidence so as to shock one's sense of justice. We disagree.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [fact-finder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [factfinder's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." Commonwealth v. Landis, 2014 PA Super 69, ---A.3d --- (Pa. Super. Apr. 8, 2014)(internal citations omitted). "The denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." Commonwealth v. Diggs, 949 A.2d 873, 879-880 (Pa. 2008).

17

In Appellant's post-sentence motion, and, in particular his motion for a new trial claiming that the verdicts were against the weight of the evidence, he did present to this Court what evidence he believed to be so wholly deficient that the verdicts would shock the Court's conscience. The record bears out that an overwhelming amount of evidence was presented by the Commonwealth including an eyewitness that placed Burton at the scene of the murder and Appellant's statement to police that he was with Burton immediately before and after the time of the crime. Therefore, as the jury in its role of fact-finder may choose to believe all, part or none of the evidence, and, in this case clearly believed enough of the Commonwealth's evidence to convict Appellant, this Court finds that no error or abuse of discretion was committed in the denial of his motion for a new trial.

RICHARD A. LEWIS, JUDGE

MEMORANDUM DATED:

May 19, 2014

DISTRIBUTION: 5-19-14 @ 1:08 pm
Dauphin County District Attorney's Office
Michael D. Rentschler, Esq., 2201 N. 2nd Street, Harrisburg, PA 17110
Superior Court Prothonotary
Clerk of Courts
FILE COPY – Judge Richard A. Lewis

2014 MAY 19 PH 12: 51
DAUPHIN COUNTY PENNA
OFFICE OF CLERK OF COURT

18



COMMONWEALTH OF PENNSYLVANIA      : IN THE COURT OF COMMON PLEAS
           APPELLEE                      : DAUPHIN COUNTY, PENNSYLVANIA
                                   :

               V.                      : 1682 MDA 2012
                                   : (CP-22-CR-4623-2010)
                                   :

TYRONE LAMONT WILLIAMS          : CHARGES: HOMICIDE, ET AL
           APPELLANT

## MEMORANDUM OPINION

Defendant/Appellant, Tyrone Lamont Williams (hereinafter "Appellant" or "Williams") appeals this Court's Judgment of Sentence entered April 23, 2012. For the reasons set forth below, this Court finds that Appellant has waived his issues on appeal and as such, the appeal should be dismissed. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

Appellant appeared before this Court for a jury trial held January 23 through January 27, 2012. Appellant had been charged with homicide – murder in the first degree (Count One)[1], criminal conspiracy (Count Two)[2], and recklessly endangering another person (Count Three)[3],[4]. The jury returned a verdict of guilty on all charges.

---

[1] 18 Pa.C.S. §2501.
[2] 19 Pa.C.S. §903.
[3] 18 Pa.C.S. §2705.

On April 23, 2012, Appellant was sentenced to life imprisonment without the possibility of parole on Count One first degree murder. On Count Two – Conspiracy, Appellant was sentenced to a term of incarceration of not less than two-hundred forty (240) nor more than four hundred eighty (480) months to run concurrently with Count One along with a fine of $5,000 and costs of prosecution. Finally, on Count Three – Recklessly Endangering Another Person, Appellant was sentenced to a term of imprisonment of not less than twelve (12) months nor more than twenty-four (24) months to run concurrently with Count Two.

On May 2, 2012, Appellant filed a Post-Sentence Motion and the Commonwealth replied to the Motion on May 7, 2012. This Court by Order denied Appellant's Post-Sentence Motion on August 24, 2012. Appellant filed a timely Notice of Appeal on September 24, 2012. On October 15, 2012 this Court issued an Order directing Appellant to file of record a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) and 1925(c)(4) within twenty-one (21) days of the date of the Order. Appellant complied with this Court's Order by filing, on November 5, 2012, a Statement of Errors Complained of on Appeal.

## DISCUSSION

This Court's October 15, 2012 Order directing Appellant to file a Statement of Matters Complained of on Appeal specifically provides:

---

[4] Appellant had also been charged with Persons Not To Possess a Firearm, 18 Pa.C.S. §6105(a)(1) and Firearms – Carrying Without a License, 18 Pa.C.S. §6106. However, the Persons Not to Possess charge was severed from the remaining charges on January 23, 2012 and the Firearms charge was dismissed upon Motion.

Should defendant file a Motion for Transcripts, said transcripts shall not be ordered until the filing of the Statement of Errors. The Statement of Errors shall specify what portion of the transcript of proceedings is requested. Counsel shall attach a proposed order to the Statement of Errors referring to those portions of the transcript requested.

A failure to comply with this order may be considered as a waiver of all objections, rulings or other matters complained of.

In Appellant's Statement of Matters, he indicates that in two of the four errors asserted he would require the entire trial transcript. However, Appellant did not attach a proposed order to the Statement of Matters that referenced the portion of transcript he would be requesting. The burden falls upon the Appellant to request any transcript required under Chapter 19 of the Pennsylvania Rules of Appellate Procedure "Preparation and Transmission of Record and Related Matters – Record on Appeal From Lower Court." *See* Pa.R.A.P. 1911. Additionally, Appellant did not separately provide an Order for Transcript that is substantially in the form provided in Pa.R.A.P. 1911(c) or make arrangements for payment for the transcript. If the appellant fails to take the appropriate action required by Rule 1911, the appellate court "may take such action as it deems appropriate, which may include dismissal of appeal." Pa.R.A.P. 1911(d). Our October 15th Order also made clear that Appellant was responsible for attaching a proposed Order requesting necessary transcript portions and the non-compliance with the Order may result in the waiver of matters complained of.

When a matter is appealed, the trial court is required to supply an opinion in support of the order giving rise to the notice of appeal. Pa.R.A.P. 1925(a). Additionally,

the record on appeal, "including the transcript and exhibits necessary for the determination of the appeal, shall be transmitted to the appellate court within 60 days after the filing of the notice of appeal." Pa.R.A.P. 1931(a)(1).

On appeal, Appellant raises four issues:

1. Did the trial court err in ruling that the Commonwealth presented sufficient evidence to find Defendant guilty of the charges of first degree murder, criminal conspiracy, and recklessly endangering another person beyond a reasonable doubt and if the evidence was sufficient to find Defendant guilty of first degree murder, criminal conspiracy, and recklessly endangering another person on the basis that the Defendant and Ronald Burton, his codefendant, were accomplices?

2. Did the trial court abuse its discretion in refusing to grand Defendant's post trial [sic] motions and therefore refuse to grant Defendant a new trial on the grounds that the verdicts of guilty for the crimes of first degree murder, criminal conspiracy, and recklessly endangering another person, was so contrary to the weight of the evidence presented as to shock one's sense of justice?

3. Did the Court err, in its rulings both pretrial and at trial, by failing to suppress Defendant's inculpatory recorded statement to the police on the basis that the statement was taken at a time when Defendant was under the influence of a controlled substance and, therefore, was unable to give both a knowing and intelligent waiver of his right to counsel under Miranda and/or give a knowing, voluntary, and free statement to the police?

4. Did the Court err by refusing to suppress and/or exclude portions of Defendant's recorded statement which permitted the jury to hear evidence of other crimes, wrongs, or acts when those portions of his statement should have been excluded from the trial under Pa. Rule of Evidence Rules 403 and 404(b), because the probative value of the inclusion of those statements did not outweigh the danger of unfair prejudice to Defendant, confusion of the issues, or misleading the jury.

In the first two of these statements of error, Appellant stated that he would require the entire trial transcript however, he did not request that it be transcribed. This Court's reading of statements of error three and four gives the impression that the trial transcript would be necessary to analyze those issues as well, however, the Appellant merely indicated that the portion of the transcript pertaining to those issues is "moot."

It is not the duty of the trial court to ensure that the appellate record be complete enough to enable sufficient review of the case. It is incumbent on the Appellant to ensure that the trial record is complete "in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." Commonwealth v. Bongiorno, 905 A.2d 998, 1000 (Pa. Super. 2006) *citing* Commonwealth v. Kleinicke, 895 A.2d 562, 575 (Pa. Super. 2006)(*en banc*).

According to the Superior Court docket, the record in this matter was due to be transmitted to the Superior Court on November 26, 2012. Pa.R.A.P. 1931. However, the discharge of this duty by the clerk of the lower court is contingent upon "when the record is complete for purposes of the appeal." Pa.R.A.P. 1931(b).

In light of the issues raised by Appellant for review, and the clear necessity of reviewing the trial transcript to dispose of them, the lack of a trial transcript prevents this Court from providing a meaningful opinion in support of the order which gave rise to the appeal. Further, "it is black letter law in this jurisdiction that an appellate court cannot consider anything which is not a part of the record in the case." Treu v.

Harleysville Ins. Co., 443 Pa. Super. 567, 571, 662 A.2d 1106, 1108 (1995) *citing* Smith

v. Smith, 431 Pa. Super. 588, 591, 637 A.2d 622, 623 (1993). An appellate court

cannot accept a trial court's assertions in its 1925 Opinion as an accurate portrayal of

what transpired at a conference or in a trial without having a transcript of the

proceedings in the certified record. *See* Commonwealth v. Young, 456 Pa. 102, 115-16,

317 A.2d 258, 264-65 (1974); Treu v. Harleysville Ins. Co., 443 Pa. Super. 567, 571,

662 A.2d 1106, 1108 (1995).

Accordingly, we therefore find that Appellant has waived his issues on appeal

and as such the appeal should be dismissed.

RICHARD A. LEWIS, JUDGE

MEMORANDUM OPINION DATED:

Dec 12 2012

2012 DEC 18 AM 9:29
DAUPHIN COUNTY PENNA
OFFICE OF CLERK OF COURTS

Distribution: 12/18/12 kmB @ 9:50 Am.
DA -I.o.
PD -I.o.
Judge Lewis I.o.
Defendant - MACU